FILED _____ LODGED
_____ RECEIVED _____ COPY

FEB 2 5 2016

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
B._____ DEPUTY

Brian Edward Malnes
2157 West Alaska Avenue
Flagstaff, Arizona, 86001
928-774-4580

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Brian Edward Malnes, | ) | **CV-16-08008-PCT-GMS** |
| | ) | |
| | ) | |
| Plaintiff *Pro se*, | ) | **RESPONSE TO DEFENDANTS'** |
| | ) | **MOTION TO DISMISS** |
| vs. | ) | |
| | ) | |
| | ) | |
| State of Arizona, Michele Reagan | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | **ORAL ARGUMENTS REQUESTED** |

Brian Edward Malnes (Plaintiff) comes before the Court to file a "Response to 'Defendants' Motion to Dismiss (Doc. 15)'." The State of Arizona and Michele Reagan (Defendants), state that a claim wasn't made for which relief can be granted. However, it seems completely illogical for the Defendants to make this assertion, as the Defendants have violated the U.S. Constitution, in A.R.S. § 16-101(A)(5) as stated in the Amended Complaint, which the Defendants claim is Constitutional. The Defendants point to the 14th Amendment as the catchall for felony disenfranchisement, which indeed has been argued as the Defendants cite in (Doc. 15), however, the Plaintiff's complaint does not deal with the 14th Amendment, but the 15th and the 26th, both of which amend portions of the 14th Amendment.

Brian Edward Malnes, *Pro se*

The claim the Plaintiff is making is this:

1. Plaintiff attempted to register to vote.

2. The State of Arizona, and Michele Reagan, Secretary of State (Defendants) maintains a law that precludes franchise to felons.

3. Plaintiff is suing, and going to file for an injunction to stop this Un-Constitutional act from happening.

4. Plaintiff like all ex-felons is a slave as defined in the 13th Amendment. "Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction." Thus, by definition found in the U.S. Constitution, ex-felons are ex-slaves.

5. The 15th Amendment declares it to be Un-Constitutional to deny franchise to ex-slaves (same word "servitude" is used synonymously in both the 13th and 15th Amendments), "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude."

6. Because the 15th Amendment expressly states that Arizona cannot deny franchise, not just for race, or the color of one's skin, but because of any "past condition of servitude."

7. By denying franchise the Defendants are violating the Constitutional mandate given in the 15th Amendment, which is "Depravation of rights under color of law," 18 U.S. Code § 242. In addition, 18 U.S. Code § 241 – "Conspiracy against rights," has

Brian Edward Malnes, *Pro se*

logically occurred in the maintenance of an Arizona Revised Statute that is a violation of rights.

Because of the nature of this suit, and the statement that "the Amended Complaint is a string of incorrect legal conclusions," it is critical to look at the power of Franchise in order to make sense of the Amended Complaint. The Defendants in their Motion (Doc. 15) give a brief history of felony disenfranchise beginning with the Greco-Roman era, but the gist of their argument/history is that felony disenfranchisement is traditional, and thus legal, is of course, sophistry. To offer that Maine and Vermont are the only states that are obeying the Constitution (15th Amendment) in allowing suffrage to felons is a weak argument along the lines of "It's okay because everyone is doing it."

The concept of taxation without representation an ideal that was instrumental in the foundation of Our Country. The *Declaration of Independence* defines what the majority of American colonists agreed was freedom, and the right to follow their own moral understanding: "That whenever any Form of Government becomes destructive of these ends, it is the Right of the People to alter or to abolish it, and to institute new Government, laying its foundation on such principles and organizing its powers in such form, as to them shall seem most likely to effect their Safety and Happiness." The Founding Fathers[1] saw themselves as prisoners of Great Britain, forced to live life as second-class citizens, forced to labor under the growing strain of mercantilism. The only solution they found was to break the law to establish a new order—the *U.S. Constitution.*

"When in the Course of human events it becomes necessary for one people to dissolve the political bands which have connected them with another and to assume among the powers of the earth, the separate and equal station to which the Laws of Nature and of Nature's God entitle them." Jefferson identified the "Laws of Nature" as synonymous with morality, the instinctive

---

[1] Delegates to the Constitutional Convention, 21 Feb. 1787.

3

understanding of what is right and wrong instilled by God (in this instance the term God is used to indicate any connotation of a supreme being that is at once: omniscient, omnipresent, and omnibenevolent—instilling in the created a sense of right and wrong). Making the "Rights of the People," something that derives from God, not man. And so, the American colonists took their God given rights from the law and order un-naturally imposed by Great Britain. Creating a new form of citizenship[2] in the United States, *Constitutionally Protected Persons* (Citizen), which at the time of the Constitutional Convention in 1787 meant: Free White males 16 years of age and older.

In 1790, the United States conducted its first census under the direction of Secretary of State Thomas Jefferson.[3] The census asked for an enumeration of the following classes of individuals living in America:

- Free White males of 16 years and upward (to assess the country's industrial and military potential)
- Free White males under 16 years of age
- Free White females
- All other free persons
- Slaves

**Exhibit 1** is a chart showing percentages of groups living in the United States in 1790.

Because of the nature of the *U.S. Constitution* at its inception, only 20% of those living in the United States were Citizens as expressed in **Exhibit 2**. Thus, the *U.S. Constitution* created a difference in meaning between freedom and citizenship.

---

[2] A *citizen* is defined as, "A member of a state, an enfranchised inhabitant of a country, as opposed to an alien; in *U.S.*, a person, native or naturalized, who has the privilege of voting for public offices, and is entitled to full protection in the exercise of private rights." *Source*. Def. 2.a. Oxford, *Oxford English Dictionary*. Web. 1 June 2014.
[3] Jefferson, Thomas. United States. *Return of the Whole Number of Persons Within the Several Districts of the United States* (Philadelphia, 1793), 1. Print.

Brian Edward Malnes, *Pro se*

As defined by the *Oxford English Dictionary*, a citizen is one who is enfranchised as an inhabitant of a country.[4] Thus, the ability to vote is the key element in what constitutes a Citizen in the United States, and by extension the State of Arizona. Although the *U.S. Constitution* did not contain specific qualifications for franchise, the next 200 years in the political life of the United States would see the right to vote given to almost every group of individuals legally living in America. This transformation in voting rights is illustrated in **Exhibit 3**.

Today, the State of Arizona is denying franchise, and thus citizenship to those in the prisoner class (ex-felons), but not only to the prisoners themselves, but to their families, and by extension many members of the Arizona community. The idea that millions of Arizonians are not represented in their own government is contrary to the intent of this Nations Founders. And so, the Defendants must be held responsible for this breach in the citizenship of those who reside in the State. And the only defense they offer is tradition. It is not necessary for the Plaintiff to begin to discuss the plethora of U.S. Supreme Court cases that overturned existing "tradition."

Because the Defendants are violating the 15th Amendment it is important to identify what a slave in 2016 America is, according to the U.S. Constitution. The 13th Amendment to the *U.S. Constitution*, Article XIII, Section 1 reads, "Neither slavery[5] nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction." On February 1, 1865 the 38th Congress of the United States made slavery illegal in America. But, instead of totally eliminating slavery a concession was reached that allowed slavery for those sentenced to "hard labor" in the United States.

The reason that "slavery nor involuntary servitude" were not totally abolished was due to the fact the practice was a military necessity during the Civil War when the 13th Amendment was approved.

---

[4] "Citizen," Def. 2.a. Oxford, *Oxford English Dictionary*. Web. 1 June 2014.
[5] "Slavery," Def 3.a. "The condition of a slave; the fact of being a slave; servitude; bondage." Oxford, *Oxford English Dictionary*. Web. 17 June 2014.

Brian Edward Malnes, *Pro se*

"During the Civil War, 'sentences simply of *hard labor*, or of *hard labor at the public works,* or of certain particular labor or labor on particular works—as fortifications, bridges, roads, &c., or in breaking stone—unconnected in the sentence with confinement, were not [infrequently] imposed.'[6] Reported sentences from the Civil War include one prisoner sentenced to 'serve at hard labor for a certain term 'with an iron collar around his neck weighing eight pounds,'[7] and another sentenced to hard labor 'chained to a wheelbarrow.'[8] Again, there is no historical requirement that this labor be productive labor and the Civil War demonstrates the historical acceptability of unproductive, and thus purely punitive labor, making a distinction between 'hard labor' and 'hard labor at the public works.'"[9]

The military necessity that drove the caveat, "except as a punishment for crime whereof the party shall have been duly convicted," in the 13th Amendment, created a new set of terms to replace the terms of the now abolished slave institution in America. Before the passage of the 13th Amendment the population could be divided into two groups: Americans and prisoner/criminal/slave/outlaw or simply prisoner. After the Blacks were made free in the United States (not Citizens due to their inability to vote), the antithesis of freedom changed to prisoner/criminal/outlaw or simply prisoner, as slavery was abolished. However, the caveat in the 13th Amendment created a new slave in America, and that term is simply prisoner (See **Exhibit 4**).

The end of the Civil War brought the period of Reconstruction in the South. Without the slave population that maintained the infrastructure of the South, a new source of slave labor was necessary—the prisoner. And the most recognizable use of slave/hard labor in prisoner populations in the South was the chain gang. After the passage of the 13th Amendment the South

[6] Winthrop, William. United States. War Department. *Military Law and Precedents: Volume 1.* Doc. No. 1001. 1886. 421. Print.
[7] Ibid, 421 (citing Gen. Order (unnumbered) 31 Oct. 1820).
[8] Ibid, 398.
[9] Berger, Joseph. United States. Department of the Army. "Making Little Rocks Out of Big Rocks: Implementing Sentences to Hard Labor Without Confinement." *The Army Lawyer*. 27-50-379. Dec. 2004. 3. Web. 12 June 2014.

Brian Edward Malnes, *Pro se*

had an abundance of chains and iron bracelets that had recently become unnecessary, directly linking chain gangs to slavery. "Using chains as punishment in a culture where chains are intimately connected with the subjugation of a race implicitly embraces slavery. The enslavement of people is unacceptable by any standard of decency."[10]

"The slave codes of the anti-bellum period were the basis of the black codes of 1865-66 and later were resurrected as the segregation statutes of the period after 1877. The legal heritage of slavery did not end with its demise."[11] Slavery simply changed names and faces, and became the racially homogeneous prisoner. And with the elimination of the plantation system, the labor force created by the 13th Amendment became an economic tool that could be leased, often to do the same jobs previously occupied by slaves. "This system of forced labor also continued during and after Reconstruction through convict labor. There were few choices for 'convicts.' The state either leased the convicts to private interests, forced them into criminal surety contracts under which a period of servitude for a private employer was exchanged for the payment of a criminal fine, often based on petty or exaggerated charges, or placed them on a state or county chain gang. A prison official, writing in 1904, noted the conditions of convicts and related that 'The Negro Convict Is A Slave,'[12] and the state, a collective slavemaster."[13]

The statement "The Negro Convict Is A Slave," is accurate, but it excludes all other races. The statement is derivative of the notion that slavery never ended, just became penal labor. However, the military hard laborers (primarily White) mixed with the abolished slaves (Blacks) to create the homogenous group prisoner, which would make the above statement much more accurate if it read—The Prisoner Is A Slave.

---

[10] Gorman, Tessa. "Back on the Chain Gang: Why the Eighth Amendment and the History of Slavery Proscribe the Resurgence of Chain Gangs." *California Law Review*. 85:2, Mar. 1997. 447. Print.
[11] Finkelman, Paul. "Exploring Southern Legal History." *North Carolina Law Review*. 64, 1985. Print.
[12] Fierce, Milfred. *Slavery Revisited: Blacks and the Southern Lease System 1865-1993*. (Brooklyn: African Studies Center, 1994). Print.
[13] Gorman, "Back on the Chain Gang: Why the Eighth Amendment and the History of Slavery Proscribe the Resurgence of Chain Gangs," 449. Print.

Brian Edward Malnes, *Pro se*

In a 1920 report filed by Chester County, South Carolina, the way prisoners are segregated by race is clarified: "The white men now on the gang are not separated on the road as they are in the camp, although Act 312, *Acts of 1912*,[14] require that on county chain gangs 'a separation of the sexes and races be at all times observed.' As a consequence of this Act most of the counties in the State do not attempt to work whites unless they have enough to form a separate gang of them. The long term men are sent to the Penitentiary and those sentenced for less than six months are left in the county jail."[15]

It is clear from this report that although the races are housed separately, the labor is shared by all: "The white men now on the gang are not separated on the road as they are in the camp." The American chain gang was completely phased out of the criminal justice system in the United States, with Georgia being the last State to use the practice in 1955.[16] The public outcry against the use of slave labor on the roads of the United States forced the correctional system to move all the forced labor inside—behind the walls where everything is kept hidden, and dinosaurs still roam. However, the need for labor and ordered subjugation did not end.

In 1995, forty years after the practice was discontinued in the United States, the get tough on crime campaign that started in the 1980s, inspired the State of Alabama to reintroduce chain gangs. One year later, the practice was stopped everywhere except Arizona where today Maricopa County prisoners still live in tent cities in the desert sun.[17] Recently, other states have reintroduced the practice of forced slave labor on the roads with varying results.

---

[14] Act 312 reads, "An Act to amend an Act entitled 'An Act to provide for working all able-bodied men convicts on the public works of the various counties,' approved the 18th day of February, A. D. 1911, by making same applicable to Clarendon county." *Source*. South Carolina. *Acts and Joint Resolutions also Certain Concurrent Resolutions of the General Assembly of the State of South Carolina: Passed at the Regular Session of 1912* (Columbia: Gonzales and Bryan, State Printers, 1912,) IV. Print.

[15] South Carolina. "The Chester County Chain Gang Report: Made July 31, 1920." *First Annual Report of the State Board of Public Welfare of South Carolina 1920* (Columbia: Gonzales and Bryan, State Printers, 1920,) 111. Print.

[16] Roth, Mitchel. *Prisons and Prison Systems* (Westport: Greenwood Press, 2006). Print.

[17] Banks, Cyndi. *Punishment in America* (Santa Barbara: ABC-CLIO, 2005). Print.

8

In March of 2013, Spartanburg County, South Carolina Sheriff Chuck Wright said he was working with lawmakers in the State to reintroduce chain gangs. The Sheriff wanted to make a change in what he saw was a current problem in corrections: "I envision them not sitting around in the jails and getting fat on our dollar...I envision them working six days a week, 12 hours a day and not being sentenced to 15 years at the taxpayers' expense."[18]

What Wright is envisioning is forced slave labor that can be leased to State departments or private interests where prisoners are measured on their ability to produce work for the State. However, this type of forced slave labor has existed since 1934 within the Bureau of Prisons—Federal Prison Industries (FPI), also known by its brand name UNICOR.[19]

UNICOR is a corporation that is profitable primarily on the use of slave labor inside factories within all Federal prisons. Prison industries hidden behind walls, was a natural extension in the history of prison labor in the United States, as seen graphically in **Exhibit 5**. Today the master morality of the United States maintains a prisoner slave labor population of over 1.5 million, which is a steady growth in this labor pool over the last 30 years. This slave labor force has a yearly value of approximately $18 billion, which is a sum larger than the Gross National Product (GNP) of 79 countries in the world, making UNICOR and its counterparts unwilling to give up control of such a lucrative labor pool. And two of the biggest counterparts to UNICOR are the private prison corporations: CCA and GEO, both of which operate for-profit prisons in the State of Arizona. The success of GEO, CCA, and UNICOR is predicated on human misery. These for-profit corporations use prisoner slave labor to capitalize on the boom in the U.S. incarceration rate over the last 30 years. In its "Annual Report Pursuant to Section 13 or 15(d) of the *Securities Exchange Act of 1934*[20] for the Fiscal Year Ended December 31, 2010, Form 10-K," CCA stated:

---

[18] Moore, Graeme. "Spartanburg Sheriff Wants to Reinstate Chain Gangs." *WSPA-CBS* 7. 12 Mar. 2013. Web. 16 June 2014.

[19] Roberts, J. United States. Dept. of Justice. *Factories with Fences: The History of Federal Prison Industries*. NCJ 173540. 1996. Web. 9 June 2014.

[20] United States. 73rd Congress. *Securities Exchange Act of 1934*. 73-291. 6 June 1934.

Brian Edward Malnes, *Pro se*

"The demand for our facilities and services could be adversely affected by the relaxation of enforcement efforts, leniency in conviction or parole standards and sentencing practices or through the decriminalization of certain activities that are currently proscribed by our criminal laws. For instance, any changes with respect to drugs and controlled substances or illegal immigration could affect the number of persons arrested, convicted, and sentenced, thereby potentially reducing demand for correctional facilities to house them."[21]

Thus, the prisoner-industrial-complex in the United States is dependent on the slavery of human beings for profit. And so, individual human life stays in perpetual bondage due to greed—a decidedly immoral National institution[22] that lacks any grounding in the concepts of *Justice, Law, Liberty,* and *Freedom*. The Defendants want to maintain this bondage based on the financial incentives, and political considerations inherent with the massive amount of money generated by slave labor. CCA, who does business with the State of Arizona within the prison-industrial-complex of the State, stated that changes in *Freedom* will determine its bottom line, to all intense and purposes the interest of the State to deny franchise, and any possible democratic address, "taxation without representation," also conforms to this stated desire to maintain the status quo, "The demand for our facilities and services could be adversely affected by the

---

[21] Corrections Corporation of America. "Annual Report Pursuant to Section 13 or 15(d) of the *Securities and Exchange Act of 1934* for the Fiscal Year Ended December 31, 2010, Form 10-K." CCA. Web. 4 July 2014.

[22] Senator John C. Calhoun of South Carolina called slavery a "peculiar institution" in his speech before the U.S. Senate in 1837 defending the practice of slavery: "The peculiar institution of the South—that, on the maintenance of which the very existence of the slaveholding States depends, is pronounced to be sinful and odious, in the sight of God and man; and this with a systematic design of rendering us hateful in the eyes of the world—with a view to a general crusade against us and our institutions. This, too, in the legislative halls of the Union; created by these confederated States, for the better protection of their peace, their safety, and their respective institution; —and yet, we, the representatives of twelve of these sovereign States against whom this deadly war is waged, are expected to sit here in silence, hearing ourselves and our constituents day after day denounced, without uttering a word; for if we but open our lips, the charge of agitation is resounded on all sides, and we are held up as seeking to aggravate the evil which we resist. Every reflecting mind must see in all this a state of things deeply and dangerously diseased." *Source.* Calhoun, John. "The 'Positive Good' of Slavery." U.S. Senate. Washington, D.C. 1837. Speech.

Brian Edward Malnes, *Pro se*

relaxation of enforcement efforts, leniency in conviction or parole standards and sentencing practices."

 

The Defendants have further cited the 11th Amendment stating that the Plaintiff cannot sue the State of Arizona for violating Civil Rights. The question of sovereign immunity as understood in the 11th Amendment is a very contentious one with no firm answer. The Defendants have cited numerous cases that discuss sovereign immunity, but no settled definition exists, only interpretations of the 11th Amendment. To that end it is important to consider *Nevada v. Hall*, 440 U.S. 410, in which the High Court found: "A State is not constitutionally immune from suit in the courts of another State." This seems to discount the 11th Amendment altogether, "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." And if the Court held that the State does not have sovereignty in another States courts, how does the State of Arizona have sovereignty in Federal Court? The Defendants cite *Ex Parte Young*, 209 U.S. 123 (1908), which finds that the 11th Amendment does not prohibit suits between states or suits by the United States against a state. *Young* primarily held that if government officials attempt to enforce an unconstitutional law, sovereign immunity does not prevent people whom the law harms from suing those officials in their individual capacity for injunctive relief. This is because they are not acting on behalf of the state in this situation, "Whether a state statute is unconstitutional because the penalties for its violation are so enormous that persons affected thereby are prevented from resorting to the courts for the purpose of determining the validity of the statute, and are thereby denied the equal protection of the law, and their property rendered liable to be taken without due process of law, is a Federal question and gives the Circuit Court jurisdiction." Also, *Scheuer v. Rhodes,* 416 U.S. 232 (1974), held that, "The Eleventh Amendment does not in some circumstances bar an action for damages against a state official charged with depriving a person of a federal right under color of state law, and the District Court acted prematurely, and hence erroneously, in dismissing the

complaints as it did without affording petitioners any opportunity by subsequent proof to establish their claims. The immunity of officers of the executive branch of a state government for their acts is not absolute, but qualified, and of varying degree, depending upon the scope of discretion and responsibilities of the particular office and the circumstances existing at the time the challenged action was taken." Finally, the 11[th] Amendment question is addressed in *Fitzpatrick v. Bitzer*, 427 U.S. 445 (1976), The [11[th]] Amendment and the principle of state sovereignty that it embodies are limited by the enforcement provisions of § 5 of the Fourteenth Amendment, which grants Congress authority to enforce 'by appropriate legislation' the substantive provisions of the Fourteenth Amendment, which themselves embody significant limitations on state authority. Congress, in determining what legislation is appropriate for enforcing the Fourteenth Amendment, may...provide for suits against States that are constitutionally impermissible in other contexts." Thus there is no absolute immunity as each judicial interpretation has demonstrated.

The Plaintiff has demonstrated that there is a claim to which relief can be granted, and that the neither the State of Arizona, nor Michele Reagan enjoys sovereignty that enables them relief under the 11th Amendment. As such, the Plaintiff requests that the Defendants' Motion to Dismiss (Doc. 15) be denied, and that the Defendants provide a responsive pleading with 14 days in pursuance to F.R.C.P. 12 (a)(4)(A). In addition the Plaintiff request Oral Arguments pursuant to LRCiv. 7.2 (f), which are necessary to allow the Plaintiff to express his legal position. As a *pro se* litigant the Plaintiff is not a learned attorney who is not trained in the discourse community of the legal profession, and the Courts. As such, the Plaintiff strenuously requests Oral Arguments, as are provided for in the F.R.C.P. 12 (d), "Result of Presenting Matters Outside the Pleadings. If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." As such, the Plaintiff ought be afforded Oral Arguments in order to provide all information that is "pertinent to the motion."

Brian Edward Malnes, *Pro se*

Dated this 23rd day of February 2016.

Brian Edward Malnes

2157 W. Alaska Ave.

Flagstaff, AZ 86001

928-774-4580

malnes@me.com

Plaintiff, *Pro se*

13

**Exhibits**



**Exhibit 1** Chart showing percentages of groups living in United States in 1790.



**Exhibit 2** Relationship between Free (Citizen) and Not Free Americans in 1790.



**Exhibit 3** Changes in U.S. Voting Law (Citizenship).[1]

---

[1] This chart in no way represents all of the legislative changes to enfranchisement law in the United States. It is only



**Exhibit 4** Synonymous substitution of the term *slave* to *prisoner* (1865).



**Exhibit 5** History of Prison Labor in the United States.[2]

[2] Wagner, Peter. *The Prison Index* (Northampton: Prison Policy Initiative, 2003). Print.